**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 27 2010

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA., )
)
    Plaintiff, )
)
v. )
)
PRODUCERS RICE MILL, INC., and )
LIBERTY MUTUAL INSURANCE )
COMPANY, )
    Defendants. )

5:10-CV-313 JLH

This case assigned to District Judge Holmes
and to Magistrate Judge Kearney

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") brings this Complaint for Declaratory Judgment against Producers Rice Mill, Inc. ("Producers"), and Liberty Mutual Insurance Company ("Liberty Mutual"). In support thereof, National Union alleges as follows:

### PREFATORY STATEMENT

This action involves an insurance coverage dispute regarding a series of lawsuits for which Producers has sought coverage under certain primary commercial general liability policies issued by Liberty Mutual and commercial umbrella liability policies issued by National Union (referred to herein as the "Liberty Mutual CGL Policies" and the "National Union Umbrella Policies"). The underlying lawsuits tendered by Producers seek damages arising from Producers' alleged failure to supply the underlying plaintiffs with rice that conformed to certain specifications, in breach of its contracts with the underlying plaintiffs. It is National Union's position that Producers' shipments of allegedly non-conforming rice, in breach of its contractual obligations, were not accidents, and therefore do not constitute "Occurrences" to which liability coverage would apply. Further, even if the various allegedly non-conforming shipments made

by Producers could be deemed "Occurrences" for purposes of potentially implicating liability coverage, the underlying lawsuits do not seek to impose liability for "Property Damage" to which the Liberty Mutual CGL Policies and National Union Umbrella Policies would apply. Moreover, certain exclusions would apply, in whole or in part, even if the underlying lawsuits implicated otherwise covered injury.

Alternatively, National Union submits that its umbrella policies are potentially implicated only upon the exhaustion of all underlying insurance by payment of covered Loss. To the extent the underlying lawsuits involve liability for covered "Property Damage" that is caused by an "Occurrence," each shipment of non-conforming rice supplied by Producers constitutes a separate "Occurrence," and any "Property Damage" that may exist happened during at least two separate policy periods. As a result, the aggregate limits of at least two primary Liberty Mutual CGL Policies are implicated and must be exhausted before any National Union Umbrella Policy applies.

## PARTIES

1.      Plaintiff, National Union, is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in New York, New York. At all times relevant hereto, National Union was authorized to do business, and was doing business in the State of Arkansas.

2.      Defendant, Producers, is a domestic agricultural cooperative, organized and existing under the laws of the State of Arkansas, with its principle place of business in Stuttgart, Arkansas.

3.      Upon information and belief, defendant, Liberty Mutual, is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Massachusetts.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a), because the plaintiff and the defendants, are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      An actual controversy exists between National Union and defendants Producers and Liberty Mutual regarding the applicability of the insurance policies identified herein with respect to Producers' potential liability arising out of the underlying lawsuits described in more detail below.

6.      Venue is proper in this district pursuant to 28 U.S.C. §1391 (a) and (c) in that a substantial part of the events giving rise to this action arose in this district.  As a further matter, Producers has its principal place of business within this judicial district, which confers personal jurisdiction over Producers in this Court, and Liberty Mutual has sufficient minimum contacts within this judicial district, including its issuance of policies of insurance to Producers in this district, so as to confer personal jurisdiction over Liberty Mutual in this Court.

## BACKGROUND

### A.      General Background

7.      In this action, National Union seeks a declaration concerning its rights, duties, and obligations, if any, under the National Union Umbrella Policies, with respect to the following group of lawsuits tendered by Producers, all of which involving claims made by European Union ("EU") based wholesalers and distributors of long-grain rice supplied by Producers: *Tilda Ltd. v. Riceland Foods Inc. et al.*, Case No. 07 cv 0457 CDP ("the Tilda Lawsuit"); *Veetee Rice Limited v. Riceland Foods, Inc., et al.*, Case No. 07 cv 1211 CDP ("the Veetee Lawsuit"); *Riviana Foods Inc. v. Bayer AG et al.*, Case No. 08 cv 00375 CDP ("the Riviana Lawsuit"); *Westmill Foods Ltd. v. Riviana Foods Inc., et al.*, Case No. 09 cv 00938 CDP ("the Westmill Lawsuit"); *Van*

*Sillevoldt Rijst B.V. v. Riviana Foods, Inc., et al.,* Case No. 09 cv 00941 CDP ("the Van Sillevoldt Lawsuit"); *Rickmers Reismühle GmbH v. Producers Rice Mill Inc.,* Case No. 08 cv 00500 CDP ("the Rickmers Lawsuit"), and a Notice of Claim, filed in 2007 by Soufflet Alimentaire in the Commercial Court of Valenciennes, France ("the Soufflet Claim") (collectively "the Underlying Lawsuits").

8.      The import and sale of genetically modified ("GM") rice is prohibited by EU regulation, and the plaintiffs in each of the Underlying Lawsuits each asserted that the presence of GM rice in shipments supplied by Producers constituted breaches of Producers' express and implied warranties to supply only non-GM rice.

9.      The Underlying Lawsuits do not seek to impose liability for loss because of damages to which the National Union Umbrella Policies apply, and National Union therefore seeks a judgment against Producers on this basis, as more fully described herein.

10.     In the alternative, National Union avers that, to the extent any of the lawsuits tendered by Producers seeks to impose, or has imposed liability for covered "Property Damage" caused by an "Occurrence," each affected shipment of rice giving rise to a covered claim, constitutes a separate "Occurrence."   Accordingly, to the extent that one or more of the Underlying Lawsuits seeks to impose, or has imposed liability on Producers for covered "Property Damage" caused by an "Occurrence," National Union seeks a declaration with respect to the applicable limits of the scheduled underlying commercial general liability policies issued to Producers by Liberty Mutual.

**B.      Producers' Operations and Business with EU Buyers**

11.     Producers is engaged in the business of milling and selling rice.  Producers sells rice in the United States and exports rice to buyers around the world, including buyers doing business in the EU.

4

12.     Producers relies upon independent international commodities brokers to arrange its sales to EU rice buyers, many of which purchase quantities of rice from a number of different U.S. rice mills and rice distributors, including Riceland Foods, Inc. ("Riceland"), Planters Rice Mill, LLC ("Planters"), and Riviana Foods, Inc. ("Riviana").

13.     The EU buyers who purchase from U.S. sellers, such as Producers, are generally engaged in the business of marketing, and distributing rice and rice products throughout the EU.

14.     At all times relevant to the Underlying Lawsuits, EU regulatory authorities prohibited the import and sale of GM rice to EU member countries.

15.     Upon information and belief, as a result of the EU restrictions on the import and sale of GM rice, at all times relevant to the Underlying Lawsuits, it was the practice of EU rice buyers to require assurances and/or contract terms warranting that the rice they purchased from Producers and other U.S. sellers would not be genetically modified.

**C.     The Infiltration of Commercially Grown U.S. Long-Grain Rice by GM Rice**

16.     On August 18, 2006, the United States Department of Agriculture ("USDA") announced that trace amounts of a regulated line of GM rice, called Liberty Link 601 (LLRICE 601), had been detected in samples of U.S. commercially grown long-grain rice.

17.     Upon information and belief, at the time of the USDA announcement, GM rice was not commercially grown in the United States. While some varieties of GM rice had been approved for commercial farming in the U.S., GM rice had never been commercially grown. Meanwhile, other strains of GM rice, such as LLRICE 601, had been, or were being test planted at agricultural research facilities.

18.     Upon information and belief, LLRICE 601 was developed by Bayer AG, Bayer CropScience, and various other affiliated and/or predecessor entities (hereafter "Bayer"), and engineered to be resistant to Liberty 9 Herbicide, a weed killer that is also produced by Bayer.

19.     Upon information and belief, between 1999 and 2001, Bayer engaged an agricultural research station at Louisiana State University ("LSU") to grow test crops of LLRICE 601 on its behalf.

20.     Following the discovery of LLRICE 601 in commercial crops, the USDA concluded that the LLRICE 601 which infiltrated U.S. commercial crops had likely originated from crops grown at LSU's test facility.

21.     Upon information and belief, at the time of the USDA's August 18, 2006 announcement, the engineered protein found in LLRICE 601 was approved for use in other U.S. crops, such as soybeans, corn, and canola, but was not authorized for use in commercial rice crops in the U.S. or anywhere in the EU.

22.     Upon information and belief, beginning at least as early as 2003, the EU had adopted stringent regulations prohibiting the import and sale of GM products.

23.     Upon information and belief, in response to the USDA's August 2006 announcement, the EU issued new guidelines, restricting the import and sale of U.S. grown rice to shipments that could be certified as GM free after testing.

**THE UNDERLYING LAWSUITS**

24.     The Underlying Lawsuits relate to shipments of rice that were delivered or en route to buyers in the EU, and were found to contain GM rice. Producers' liability, if any, with respect to the Underlying Lawsuits, relates exclusively to its shipment of GM rice to Europe, in violation of EU regulations, and in breach of its contractual obligations.

25.     In addition to claims against Producers and other rice sellers, such as Riceland, several of the Underlying Lawsuits also set forth claims against Bayer, related to Bayer's alleged failure to take adequate measures to prevent the escape of LLRICE 601 from the LSU test facility, and alleged failure to timely warn regulatory authorities of the possible infiltration of

GM rice into U.S. commercial crops. The Underlying Lawsuits do not contend that Producers was in any way responsible for the escape of LLRICE 601 from the LSU test facility, or for the infiltration of LLRICE 601 into U.S. commercial crops.

26.     With the exception of the Soufflet Claim, which is pending in Valenciennes, France, the Underlying Lawsuits were all consolidated into multidistrict litigation, captioned *In Re: Genetically Modified Rice Litigation*, Master Case No. 4:06 MD 1811 CDP, pending in the U.S. District Court for the Eastern District of Missouri ("the Consolidated GM Rice Litigation").

27.     The Consolidated GM Rice Litigation encompasses all claims that relate to the infiltration of LLRICE 601 into U.S. commercial crops of long-grain rice, as well as the claims of EU buyers of long-grain rice that was determined to contain quantities of LLRICE 601.  In all, the Consolidated GM Rice Litigation includes more than 360 lawsuits.

28.     As of the date of the filing of this lawsuit, Producers has entered or will enter into settlement agreements with respect the claims against it in the Riviana, Westmill, Van Sillevoldt, Tilda and Veetee Lawsuits.

29.     The amounts paid or to be paid, and/or the business considerations given by or on behalf of Producers in settlement of the Riviana, Westmill, Van Sillevoldt, Tilda and Veetee Lawsuits do not constitute damages for covered "Property Damage" caused by an "Occurrence" within the meaning of the National Union Umbrella Policies, or within the meaning of the scheduled underlying Liberty Mutual CGL Policies.

30.     Neither the Rickmers Lawsuit or the Soufflet Claim, which are the only two remaining unsettled actions of the Underlying Lawsuits, seek to impose liability on Producers for covered "Property Damage" caused by an "Occurrence," within the meaning of the National Union Umbrella Policies.

**A.     The Tilda Lawsuit**

31.     On January 23, 2007, Tilda, Ltd. ("Tilda"), a United Kingdom based vendor of rice and rice products, commenced an action against Producers, Riceland, and Bayer in the U.S. District Court for the Eastern District of Arkansas.  On February 13, 2008, Tilda filed a First Amended Complaint, and on December 2, 2008, a Second Amended Complaint. A copy of the Tilda's Second Amended Complaint in the Consolidated GM Rice Litigation, a copy of which is annexed hereto as Exhibit "A".

32.     The Tilda Lawsuit alleged that Tilda purchased long-grain rice from Producers and Riceland in 2006, and that that one or more of the consignments of the rice it purchased from Riceland and/or Producers in 2006 tested positive for GM rice while aboard a barge awaiting import.  As a result, the shipment(s) could not be certified for import into the EU.

33.     According to the Tilda Lawsuit, at the time of its sale(s) to Tilda, Producers knew that the import of GM rice to the EU was prohibited, and expressly warranted that it would not supply GM rice.

34.     Tilda claimed that both Producers and Riceland caused Tilda to sustain damages in the form of: (a) lost profits; (b) loss of import / export markets; (c) loss of business reputation; (d) loss of value of inventory; (e) recall costs; and (f) loss of future profits and future goodwill.

35.     Upon information and belief, in or around August 2010, Tilda agreed to settle its claim against Producers.

36.     Upon information and belief, Liberty Mutual has or will contribute to amounts paid by Producers' in settlement of the Tilda Lawsuit.

37.     To date, neither Producers nor Liberty Mutual has responded to National Union's requests for information regarding the terms of the settlement, the percentage of the settlement paid by Liberty Mutual, or the basis for Liberty Mutual's contribution to that settlement.

**B.      The Veetee Lawsuit**

38.      On April 30, 2007, Veetee, a United Kingdom based seller of rice and rice products, commenced an action against Producers, Riviana, Riceland, and Bayer in the U.S. District Court for the Eastern District of Arkansas.  On February 2, 2008, Veetee filed its First Amended Complaint in the Consolidated GM Rice Litigation.  Thereafter, on December 1, 2008, Veetee filed it Second Amended Complaint, a copy of which is attached hereto as Exhibit "B".

39.      As against Producers, Riviana, and Riceland ("the supplier defendants"), the Veetee Lawsuit alleged claims for breach of contract, breach of warranty, negligence, and violation of the Arkansas Deceptive Trade Practices Act.  The Veetee Lawsuit also sought injunctive relief, directing Producers to clean Veetee's facilities, and requested a declaration that Producers was not entitled to payment for shipments containing GM rice.

40.      The Veetee Lawsuit alleged that, on several occasions during 2006, Producers and the other supplier defendants agreed to sell shipments of rice to Veetee, and expressly warranted that the rice supplied would not be genetically modified.  Veetee contended that such representations became part of the basis of the parties' bargain, and that the sale of shipments containing GM rice by Producers and the other supplier defendants was a breach of their respective agreements with Veetee.

41.      Veetee alleged that it was required to recall, transport, store, and ultimately destroy much of the rice it purchased from Producers and the other supplier defendants, and that it suffered loss of sales, profits, and customers, as well as damage to its reputation.

42.      Upon information and belief in or around September 2010, Veetee agreed to settle its claim against Producers.

43.      Upon information and belief, Liberty Mutual has or will contribute to amounts

paid by Producers' in settlement of the Veetee Lawsuit.

44.     To date, neither Producers nor Liberty Mutual have responded to National Union's requests for information regarding the terms of the settlement, the percentage of the settlement paid by Liberty Mutual, or the basis for Liberty Mutual's contribution to the settlement.

**C.     The Riviana Lawsuit**

45.     On March 18, 2008, Riviana Foods, Inc. ("Riviana"), a Houston, Texas based processor, marketer, wholesaler, distributor, and exporter of rice products, filed suit against the Bayer, Producers, Riceland, and Planters. Riviana later filed an amended complaint in the Consolidated GM Rice Litigation, a copy of which is annexed hereto as Exhibit "C".

46.     As against Producers, the Riviana Lawsuit alleged claims for breach of contract and breach of warranty on behalf of Riviana individually, and by Riviana acting as an assignee on behalf of various European-based affiliates.

47.     According to the Riviana Lawsuit, in 2006, Producers breached of its contract and warranties of merchantability and fitness for a particular purpose when it sold Riviana "various shipments" of long-grain rice that later proved to contain GM rice.

48.     Riviana further claimed that Producers failed to reimburse Riviana for "consequential and incidental damages," which the Riviana Lawsuit identified as costs associated with: (a) testing and monitoring rice purchased from Producers; (b) complying with the EU certification program; (c) communicating with European affiliates, and responding to the claims of these affiliates; and (d) attorneys' fees.

49.     In addition to its own claims for damages, Riviana asserted claims for breach of the warranties of merchantability and fitness for a particular purpose against Producers on behalf of its European based corporate affiliates, Boost Nutrition C.V. ("Boost"), Euryza Reis GmbH

("Euryza"), Vogan & Co., Ltd. ("Vogan"), and Panzani, S.A.S. ("Panzani").

50.     On behalf of Boost, Euryza, Vogan, and Panzani, the Riviana Lawsuit alleged consequential and incidental damages for: (a) costs of testing and monitoring rice purchased from Producers; (b) costs associated with the EU certification program; (c) lost profits from lost sales and cost of cover; (d) damage to business reputation; (e) costs of communicating with customers and responding to customer claims; (f) compensation to customers; and (g) value of the rice being stored.  Riviana also sought a declaratory judgment, requiring Producers to indemnify it for any liability Riviana may have to Boost, Euryza, Vogan, and Panzani.

51.     In or around April 2010, the parties to the Riviana Lawsuit entered into a settlement agreement, resolving Riviana's claims against Bayer, and against Riceland and Producers.  The Riviana Lawsuit was subsequently dismissed by order entered June 7, 2010.

52.     Producers has previously acknowledged to Liberty Mutual and National Union that its primary purpose in providing consideration to Riviana was business related, and that Producers does not expect its liability coverage to indemnify it for the cost of that consideration.

**D.     The Westmill Lawsuit**

53.     On May 11, 2009, Westmill Foods, Ltd. ("Westmill"), a United Kingdom based company, engaged in the business of importing rice to the EU, commenced an action against Producers, Riviana, and Bayer in the U.S. District Court for the Eastern District of Arkansas. The lawsuit was subsequently consolidated with the multidistrict litigation, and Westmill later filed its first and second amended complaints.  A copy of Westmill's Second Amended Complaint is attached hereto as Exhibit "D".

54.     As against Producers, the Westmill Lawsuit alleged that, pursuant to the terms of its contracts with Westmill, Producers agreed to supply Westmill with rice that complied with all applicable EU regulations. Producers, however, allegedly supplied Westmill with shipments that

11

contained GM rice, in breach of its contractual obligations.

55.     According to the Westmill Lawsuit, following the USDA's August 2006 announcement, Westmill advised Producers and Riviana that they would be required to certify all incoming rice shipments as GM free. Westmill asserted that, notwithstanding these efforts, subsequent shipments from Producers and Riviana tested positive for GM rice.

56.     Westmill claimed that Producers' shipments containing GM rice caused Westmill to sustain various damages, which allegedly included costs of: (a) returned rice; (b) product withdrawal; (c) cover resulting from the purchase of more expensive substitute rice; (d) loss of unusable stock; (e) unusable packaging; (f) rice processing charges; (g) testing charges; and (h) lost profits.

57.     Upon information and belief, on or about July 2, 2010, Westmill agreed to settle its claim against Producers.

58.     Upon information and belief, Liberty Mutual has or will contribute to amounts paid by Producers' in settlement of the Westmill Lawsuit.

59.     To date, neither Producers nor Liberty Mutual have responded to National Union's requests for information regarding the terms of the settlement, the percentage of the settlement paid by Liberty Mutual, or the basis for Liberty Mutual's contribution to the settlement.

**E.      The Van Sillevoldt Lawsuit**

60.     On May 19, 2009, Van Sillevoldt Rijst B.V. ("Van Sillevoldt"), a Dutch importer of rice to the EU, filed an action against Producers, Riceland, Riviana, and Bayer in the U.S. District Court for the Eastern District of Arkansas. Van Sillevoldt subsequently filed its first and second amended complaints in the Consolidated GM Rice Litigation. A copy of Van Sillevoldt's Second Amended Complaint is attached hereto as Exhibit "E".

61.     As against Producers, the Van Sillevoldt Lawsuit alleged that Producers agreed to deliver Van Sillevoldt rice that complied with "all EU laws and regulations," and expressly warranted that the rice would be non-GM.

62.     Van Sillevoldt alleges that, following the USDA's August 2006 announcement, it tested all incoming shipments as well as shipments already in the EU.   Shipments of rice supplied by to Van Sillevoldt by Riviana, Producers, and Riceland allegedly tested positive for GM rice.

63.     Upon notification of the test results, several of Van Sillevoldt's customers allegedly requested credits.

64.     The Van Sillevoldt Lawsuit asserted that Van Sillevoldt incurred the following damages: (a) payments to customers who demanded recall and compensation; (b) costs incurred by repackaging test-negative returned rice for sale in other markets; (c) costs of unusable stock and costs incurred by Van Sillevoldt to clean facilities to avoid contamination; (d) costs for unusable packaging, new packaging and reshipping, including costs of cover and reshipping to other markets where GM rice could be sold; and (e) GM testing charges.

65.     Upon information and belief, on or about July 9, 2010, Van Sillevoldt agreed to settle its claim against Producers.

66.     Upon information and belief, Liberty Mutual has or will contribute to amounts paid by Producers' in settlement of the Van Sillevoldt Lawsuit.

67.     To date, neither Producers nor Liberty Mutual have responded to National Union's requests for information regarding the terms of the settlement, the percentage of the settlement paid by Liberty Mutual, or the basis for Liberty Mutual's contribution to the settlement.

F.     **The Rickmers Lawsuit**

68.     On April 14, 2008, Rickmers, a German based entity engaged in the business of food production, commenced an action against Producers in Eastern District of Arkansas. Rickmers subsequently filed an amended complaint in the Consolidated GM Rice Litigation, a copy of which is annexed hereto as Exhibit "F".

69.     Rickmers claims that, since 1988, it has purchased various quantities of rice from Producers through contracts entered into by its U.S. affiliate, Rickmers USA, Inc. ("Rickmers USA").

70.     According to the Rickmers Lawsuit, in 2005 and 2006, Rickmers USA entered into a series of contracts with Producers for the benefit of Rickmers and for the use of Rickmers in Germany.

71.     The Rickmers Lawsuit alleges that, at the time of its 2005 and 2006 sales, Producers was aware of EU regulations prohibiting the import or sale of GM foods within the EU, and made repeated representations that its rice was not genetically modified.

72.     The Rickmers Lawsuit alleges that, on or about September 12, 2006, German officials discovered that long-grain rice supplied by Producers to Rickmers "was GM."

73.     According to Rickmers, Producers either elected not to test, or failed to adequately test the shipments it supplied to Rickmers to ensure that the shipments did not contain GM rice.

74.     Rickmers claims that, in a series of letters sent between September of 2006 and January of 2007, it notified Producers of the "non-conforming nature" of the rice it had delivered, and sought to recover costs it incurred as a result of the non-conforming shipments.

75.     Rickmers contends that Producers failed to make Rickmers whole for the damages it incurred in connection with the non-conforming shipments, including costs of: (a)

14

recalling and replacing food products that had been shipped; (b) purchasing substitute rice; (c) enlisting substitute brands of rice; (d) storage, freight, packaging, and/or disposal of recalled rice; (e) disposal of packaging materials used to carry the recalled rice; (f) development of new packaging material; (g) labor in connection with the recall related activities; and (h) "equalization claims" to various third-party food companies.

### G.    The Soufflet Claim

76.    In or around April 2007, Soufflet, a French based distributor of rice, filed a Writ of Summons and Notice of Claim against Producers and Riceland in the Commercial Court of Valenciennes, France.  Copies of the Writ of Summons and Notice of Claim are annexed hereto as Exhibit "G".

77.    The Soufflet Claim provides that, under the terms of a March 30, 2006 contract, Soufflet took delivery of a shipment or shipments of long-grain rice supplied by Producers, most of which Soufflet distributed to its own customers.

78.    Upon learning of the USDA's August 2006 announcement, Soufflet allegedly tested the remaining portion of the shipment or shipments it received from Producers, and discovered that some of the shipment(s) of rice contained GM rice.

79.    Soufflet claims that, based on the initial test results, it undertook emergency measures to recover most of the rice it had distributed from the affected shipment, and placed it into storage.

80.    Thereafter, in a series of letters to Producers, Soufflet advised Producers of its emergency recall efforts, and sought compensation.

81.    After Producers allegedly failed to respond, Soufflet filed the Notice of Claim, seeking appointment of a surveyor to, among other things: (a) visit the warehouse where the product is being stored; (b) set out a history of the sale, transport, loading and delivery of the

15

product; (c) take measures necessary to put an end to the storage of the product; and (d) assess the amount of damages incurred by Soufflet.

## THE UMBRELLA AND COMMERICAL GENERAL LIABILITY POLICIES

82.     National Union issued to Producers Commercial Umbrella Policy Nos. BE 2910880 and BE 2910973 for the consecutive annual periods August 1, 2005 to August 1, 2006, and August 1, 2006 to August 1, 2007.  The National Union Umbrella Policies provide coverage pursuant to Coverage Form 80517 (10/04), as modified by various endorsements.  Copies of the National Union Umbrella Policies are annexed hereto as Exhibits "H" and "I".

83.     Producers tendered each of the Underlying Lawsuits to National Union under the National Union Umbrella Policies, and National Union responded to each tender by issuing a coverage position letter, in which it reserved its rights with respect to the each of the Underlying Lawsuits.

84.     The National Union Umbrella Policies provide, in relevant part, as follows:

**I.     Insuring Agreement – Commercial Umbrella Liability**

A.     We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this insurance applies or because of Bodily Injury or Property Damage to which this insurance applies assumed by the Insured under an Insured Contract.

This amount we will pay for damages is limited as described in Section IV. Limits of Insurance.

B.     This policy applies only if:

1.     the Bodily Injury or Property Damage is caused by an Occurrence that takes place anywhere and the Bodily Injury or Property Damage occurs during the policy period.

*      *      *

16

IV.   **Limits of Insurance**

                         *        *        *

F.      This policy applies only in excess of the Retained Limit. If however a policy shown in the Schedule of Underlying Insurance forming a part of this policy has a limit of insurance:

   1.   greater than the amount shown in such schedule, this policy will apply in excess of the greater amount of valid collectible insurance; or

   2.   less than the amount shown in such schedule, this policy will apply in excess of the amount shown in the Schedule of Underlying Insurance forming a part of this policy.

                         *        *        *

M.      We will not make any payment under this policy unless and until:

   1.   the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss to which this policy applies and any applicable Other Insurance have been exhausted by the payment of Loss; or

   2.   the total applicable Self-Insured Retention has been satisfied by the payment of Loss to which this policy applies.

                         *        *        *

V.   **Exclusions**

                         *        *        *

D.      Damage to Impaired Property or Property Not Physically Injured

   This insurance does not apply to Property Damage to Impaired Property or property that has not been physically injured, arising out of:

   1.   a defect, deficiency, or dangerous condition in Your Product or Your Work; or

   2.   a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to Your Product or Your Work after it has been put to its intended use.

\*          \*          \*

E.     Damage to Property

This insurance does not apply to Property Damage to:

\*          \*          \*

4.     personal property in the care, custody or control of the insured;

\*          \*          \*

F.     Damage to Your Product

This insurance does not apply to Property Damage to Your Product arising out of it or any part of it.

\*          \*          \*

R.     Recall of Your Product, Your Work or Impaired Property

This insurance does not apply to damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1.     Your Product;

2.     Your Work; or

3.     Impaired Property;

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\*          \*          \*

**VII.   Definitions**

\*          \*          \*

18

L.    Impaired Property means tangible property, other than Your Product or Your Work, that cannot be used or is less useful because:

    1.    it incorporates Your Product or Your Work that is known or thought to be defective, deficient, inadequate or dangerous; or

    2.    you have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    1.    the repair, replacement, adjustment or removal of Your Product or Your Work; or

    2.    your fulfilling the terms of the contract or agreement.

*    *    *

P.    Loss means those sums actually paid as judgments or settlements, provided, however, that if such expenses incurred to defend a Suit or to investigate a claim reduce the applicable limits of Scheduled Underlying Insurance, then Loss shall include such expenses.

*    *    *

S.    Occurrence means:

    1.    as respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence.

    2.    as respects Personal Injury and Advertising Injury, an offense arising out of your business that causes Personal Injury and Advertising Injury.  All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

*    *    *

Y.    Property Damage means:

19

1.      physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2.      loss of use of tangible property that is not physically injury. All such loss of use will be deemed to occur at the time of the Occurrence that caused it.

\*       \*       \*

Z.      Retained Limit means:

1.      the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or

2.      the Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured.

DD.    Your Product means:

1.      any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

a.      you;

b.      others trading under your name; or

c.      a person or organization whose business or assets you have acquired; and

2.      containers (others than vehicles), materials, parts or equipment furnished in connection with such goods or products.

Your Product includes:

1.      warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of Your Product; and

2.      the providing of or failure to provide warnings or instructions.

\*       \*       \*

85.     With respect to foreign liability, the National Union Umbrella Policies contain the following relevant language by endorsement:

**Section V. Exclusions** is amended to include the following exclusion:

**Foreign Liability**

This insurance does not apply to Bodily Injury, Property Damage, or Personal Injury and Advertising Injury that occurs outside the United States of America, its territories and possessions, Puerto Rico and Canada.

However, if insurance for such Bodily Injury, Property Damage, or Personal Injury and Advertising Injury is provided by a policy listed in the Scheduled Underlying Insurance:

1.     This exclusion shall not apply, and

2.     Coverage under this policy for such Bodily Injury, Property Damage, or Personal Injury and Advertising Injury will follow the terms, definitions, conditions and exclusions of Scheduled Underlying Insurance, subject to the Policy Period, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by Scheduled Underlying Insurance.

*     *     *

86.     The National Union Umbrella Policies are excess to the Liberty Mutual CGL Policies.

87.     Liberty Mutual Commercial General Liability Policy Nos. TB2-191-010383-095 and TB2-191-010383-096, effective August 1, 2005 to August 1, 2006 and August 1, 2006 to August 1, 2007 provide underlying coverage to Producers in the amount of $1,000,000 per "Occurrence," and $2,000,000 general aggregate. Copies of the 2005-2006 and 2006-2007 Liberty Mutual CGL Policies are annexed hereto as Exhibits "J" and "K".

88.     Producers tendered the Underlying Lawsuits to National Union under the Liberty

Mutual CGL Policies, and, with the exception of the Soufflet Claim, for which it denied coverage, Liberty Mutual agreed to participate in the defense of the Underlying Lawsuits, subject to a reservation of its rights under the Liberty Mutual Polices.

89.      Upon information and belief, it is Liberty Mutual's position that its coverage obligations to Producers are limited to the single occurrence limit of a single policy period.

90.      The Liberty Mutual CGL Policies provide foreign liability coverage to Producers pursuant to the Liberty Direct Solutions for Food Processors endorsement to the Liberty Mutual CGL Policies.

91.      Under the terms of the Liberty Mutual CGL Policies, Liberty Mutual will pay those sums an insured becomes legally obligated to pay because of "Property Damage," caused by an "Occurrence," to which the Liberty Mutual CGL Policies apply.

92.      The Liberty Mutual CGL Policies define "Property Damage," in relevant part, as "physical injury to tangible property, including all resulting loss of use of that property…" and "loss of use of tangible property that is not physically injured."

93.      The Liberty Mutual CGL Policies define "Occurrence," in relevant part, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**COUNT I**
**(No "Occurrence")**

94.      National Union repeats and incorporates by reference paragraphs 1 through 93 as though fully set forth herein.

95.      The National Union Umbrella Policies provide coverage for sums in excess of the "Retained Limits" that Producers becomes obligated to pay as damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," to which the National Union

Umbrella Policies apply.

96.     The National Union Umbrella Policies potentially apply only if the "Retained Limits" of the National Union Umbrella Policies are exhausted by payment of covered "Loss."

97.     Under the National Union Umbrella Policies, the term "Occurrence" is defined, in relevant part, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

98.     The claims of the underlying plaintiffs, which are based upon violations of EU regulation and breach of contract, do not involve "Property Damage" caused by an "Occurrence," as that term is defined in the National Union Umbrella Policies.  As such, there is no coverage for the Underlying Lawsuits under the National Union Umbrella Policies.

## COUNT II
### (No "Property Damage")

99.     National Union repeats and incorporates by reference paragraphs 1 through 98 as though fully set forth herein.

100.    The National Union Umbrella Policies provide coverage for sums in excess of the Retained Limit that Producers becomes obligated to pay as damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," to which the National Union Umbrella Policies apply.

101.    Under the National Union Umbrella Policies, "Property Damage" is defined, in relevant part, as "physical injury to tangible property, including all resulting loss of use of that property," and "the loss of use of tangible property that is not physically injured."

102.    The amounts paid by or on behalf of Producers in settlement of the Riviana, Westmill, Van Sillevoldt, Tilda and Veetee Lawsuits are not payments for damages because of physical injury to tangible property, including loss of use of such property, or for damages

23

because of loss of use of tangible property that was not physically injured and, therefore, the do not constitute damages by reason of liability imposed by law for "Property Damage" as defined.

103.   The Rickmers Lawsuit and Soufflet Claim do not seek to impose liability on Producers for damages because of physical injury to tangible property, including loss of use of such property, or for damages because of loss of use of tangible property that was not physically injured, thus the Rickmers Lawsuit and Soufflet Claim do not seek damages by reason of liability imposed for "Property Damage."

### COUNT III
### (The "Your Product" Exclusion Precludes Coverage)

104.   National Union repeats and incorporates by reference paragraphs 1 through 103 as though fully set forth herein.

105.   The National Union Umbrella Policies contain Exclusion F., the "Your Product" exclusion.  The "Your Product" exclusion provides:

> This insurance does not apply to Property Damage to Your Product arising out of it or any part of it.

106.   The National Union Umbrella Policies define "Your Product," in relevant part,  as follows:

> Your Product means:
>
> 1.   any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
>    a.   you;
>
>    b.   others trading under your name; or
>
>    c.   a person or organization whose business or assets you have acquired; and
>
> 2.   containers (others than vehicles), materials, parts or equipment furnished in connection with such goods or products.

24

Your Product includes:

1.      warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of Your Product; and

2.      the providing of or failure to provide warnings or instructions.

107.    Even if the Underlying Lawsuits seek to impose, or have imposed damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," as defined, some or all of such damages would be excluded from coverage under the National Union Umbrella Policies pursuant to the "Your Product" exclusion.

## COUNT IV
### (The Care, Custody or Control Exclusion Precludes Coverage)

108.    National Union repeats and incorporates by reference paragraphs 1 through 107 as though fully set forth herein.

109.    The National Union Umbrella Policies contain Exclusion E(4), the "care, custody or control" exclusion, which provides, in relevant part:

This insurance does not apply to Property Damage to:

4.      personal property in the care, custody or control of the Insured;

110.    Even if the Underlying Lawsuits seek to impose, or have imposed damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," as defined, some or all of such damages would be excluded from coverage under the National Union Umbrella Policies pursuant to the "care, custody or control" exclusion.

## COUNT V
### (The "Impaired Property" Exclusion Precludes Coverage)

111.    National Union repeats and incorporates by reference paragraphs 1 through 108 as though fully set forth herein.

112.    The National Union Umbrella Policies contain Exclusion L., the "Impaired

Property" exclusion.  The exclusion provides, in relevant part:

> This insurance does not apply to Property Damage to Impaired Property or property that has not been physically injured, arising out of:
>
> 1.   a defect, deficiency, or dangerous condition in Your Product or Your Work; or
>
> 2.   a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

113.   The National Union Umbrella Policies define "Impaired Property" as follows:

> Impaired Property means tangible property, other than Your Product or Your Work, that cannot be used or is less useful because:
>
> 1.   it incorporates Your Product or Your Work that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> 2.   you have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
> 1.   the repair, replacement, adjustment or removal of Your Product or Your Work; or
>
> 2.   your fulfilling the terms of the contract or agreement.

114.   Even if the Underlying Lawsuits seek to impose, or have imposed damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," some or all of such damages would be excluded from coverage under the National Union Umbrella Policies pursuant to the "Impaired Property" exclusion.

## COUNT VI
### (The Recall Exclusion Precludes Coverage)

115.   National Union repeats and incorporates by reference paragraphs 1 through 114 as though fully set forth herein.

26

116.    The National Union Umbrella Policies contain Exclusion R., the "Recall" exclusion.  The exclusion provides:

> Recall of Your Product, Your Work or Impaired Property
>
> This insurance does not apply to damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> 1.      Your Product;
>
> 2.      Your Work; or
>
> 3.      Impaired Property;
>
> if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

117.    The definitions of "Your Product" and "Impaired Property" are set forth in paragraphs 111 and 118, and incorporated herein.

118.    Even if the Underlying Lawsuits seek to impose or have imposed damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," some or all of such damages would be excluded from coverage under the National Union Umbrella Policies pursuant to the "Recall" exclusion.

## COUNT VII
### (Alternative Relief – Declaration With Respect to the Number of "Occurrences")

119.    National Union repeats and incorporates by reference paragraphs 1 through 119 as though fully set forth herein.

120.    Under the terms of the Liberty Mutual CGL Policies, Liberty Mutual will pay those sums an insured becomes legally obligated to pay because of "Property Damage," caused by an "Occurrence," to which the Liberty Mutual CGL Policies apply.

27

121.    The Liberty Mutual CGL Policies define "Occurrence," in relevant part, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

122.    To the extent that one or more of the Underlying Lawsuits seeks to impose or have imposed damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," within the meaning of the Liberty Mutual CGL Policies and National Union Umbrella Policies, each shipment of rice Producers supplied to the injured plaintiffs that contained GM rice constitutes a separate "Occurrence."

123.    To the extent that Producers faces liability for covered "Property Damage" caused by an "Occurrence" involving more than one shipment containing GM rice, the general aggregate limits of the Liberty Mutual CGL Policies are implicated.

## COUNT VIII
**(Alternative Relief - Declaration With Respect to the Policy Periods Implicated)**

124.    National Union repeats and incorporates by reference paragraphs 1 through 123 as though fully set forth herein.

125.    To the extent that one or more of the Underlying Lawsuits seeks to impose or have imposed damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," within the meaning of the Liberty Mutual CGL Policies and National Union Umbrella Policies, such covered injury involves "Property Damage" that has occurred over at least two consecutive policy periods.

126.    As a result, at least two underlying primary policies issued by Liberty Mutual are implicated by the Underlying Lawsuits.

127.    The applicable limits of at least two underlying primary policies issued by Liberty Mutual must be exhausted by payment of covered "Loss" before any of the National Union

28

Umbrella Policy is implicated.

## COUNT IX
### (Alternative Relief - Declaration With Respect to "Property Damage" Outside the Policy Period)

128.   National Union repeats and incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

129.   The National Union Umbrella Policies apply to sums in excess of the "Retained Limits" that Producers becomes legally obligated to pay by reason of liability imposed by law for damages to which the National Union Umbrella Policies apply.

130.   The National Union Umbrella Policies potentially apply only if the "Retained Limits" of the National Union Umbrella Policies are exhausted by payment of covered "Loss."

131.   The National Union Umbrella Policies potentially apply only if the "Property Damage" is caused by an "Occurrence" and the "Property Damage" occurs during the policy period(s) of the National Union Umbrella Polices

132.   To the extent Producers' settlements of the Riviana, Westmill, Van Sillevoldt, Tilda and/ or Veetee Lawsuits involved payment for damages by reason of liability imposed by law for "Property Damage" caused by an "Occurrence," within the meaning of the Liberty Mutual CGL Policies and National Union Umbrella Policies, any amounts paid for "Property Damage" occurring outside the policy periods of the National Union Umbrella Policies would not qualify as payment for covered "Loss" for purposes of exhausting the Retained Limits of the National Union Umbrella Policies.

## COUNT X
### (Alternative Relief - Declaration With Respect to the "Retained Limits")

133.   National Union repeats and incorporates by reference paragraphs 1 through 132 as though fully set forth herein.

134.   The National Union Umbrella Policies provide coverage for sums in excess of the "Retained Limits" that Producers becomes obligated to pay by reason of liability imposed by law for damages to which the National Union Umbrella Policies apply.

135.   The National Union Umbrella Policies potentially apply only if the "Retained Limits" of the National Union Umbrella Policies are exhausted by payment of covered "Loss."

136.   For one or more of the reasons set forth herein, the "Retained Limits" of the National Union Umbrella Policies have not been exhausted by payment of covered "Loss," and the National Union Umbrella Policies are therefore not implicated in connection with the Underlying Lawsuits.

WHEREFORE, Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays that this Court enter a judgment in its favor and against Defendants, Producers Rice Mill and Liberty Mutual Insurance Company:

a.   Declaring that the Underlying Lawsuits do not implicate coverage under the National Union Umbrella Policies;

b.   Declaring that Producers' settlements in the Riviana, Westmill, Van Sillevoldt, Tilda and Veetee Lawsuits do not involve payments for liability for "Property Damage" caused by an "Occurrence," and therefore do not constitute payments for covered "Loss" for purposes of potentially exhausting the "Retained Limits" of the National Union Umbrella Policies.

c.   Finding, in the alternative, that to the extent the Underlying Lawsuits implicate coverage for "Property Damage" caused by an "Occurrence," each shipment of rice Producers supplied to the injured plaintiffs that contained GM rice constitutes a separate "Occurrence;"

d.   Finding, in the alternative, that to the extent the Underlying Lawsuits implicate coverage for "Property Damage" caused by an "Occurrence," the applicable limits of both Liberty Mutual CGL Policies must be exhausted by payment of covered "Loss" before any National Union Umbrella Policy is implicated.

30

e.   Declaring that, for one or more of the reasons set forth herein, the "Retained Limits" of the National Union Umbrella Policies have not been exhausted by payment of covered "Loss;"

f.   Awarding all other and further relief as this Court deems just and proper.


Respectfully submitted,
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

By: _____
                T. Scott Clevenger

Dated: October 27, 2010

T. Scott Clevenger
CLEVENGER & RAY
124 West Capital Avenue #860
Little Rock, Arkansas 72201
Telephone: (501) 376-9100

Of Counsel:

Richard H. Nicolaides
Mary F. Licari
Amy P. Klie
BATES CAREY NICOLAIDES LLP
191 North Wacker Drive
Suite 2400
Chicago, IL 60606
Telephone: (312) 762-3100
Facsimile: (312) 762-3200


360436v1 / 7447

31